10-0859-cv
Jackler v. Byrne

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Argued: February 24, 2011                    Decided:  July 22, 2011)

Docket No. 10-0859-cv

_____

JASON M. JACKLER,

Plaintiff-Appellant,

- v. -

Police Chief MATTHEW T. BYRNE, Individually and in his Official Capacity,
Lt. PAUL RICKARD, in his Individual and Official Capacity and Lt. PATRICK
FREEMAN, in his Individual and Official Capacity,

Defendants-Appellees.
_____

Before:  KEARSE, SACK, and KATZMANN, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Cathy Seibel, Judge, dismissing, pursuant to Fed. R. Civ. P. 12(c), complaint brought under 42 U.S.C. § 1983 principally asserting First Amendment claims alleging retaliation against plaintiff as a probationary police officer for his refusals to make false statements in an investigation into a civilian complaint charging use of excessive force by a police officer.  See 708 F.Supp.2d 319 (2010).

Vacated in part and remanded.

Judge Sack concurs in the panel opinion and files a separate concurring opinion.

STEPHEN BERGSTEIN, Chester, New York (Bergstein & Ullrich, Chester, New York, James E. Monroe, Dupee & Monroe, Goshen, New York, on the brief), for Plaintiff-Appellant.

BRIAN S. SOKOLOFF, Westbury, New York (Mark A. Radi, Sokoloff Stern, Westbury, New York, on the brief), for Defendants-Appellees.

SCOTT A. KORENBAUM, New York, New York (Lawrence A. Vogelman, Nixon, Raiche, Manning, Vogelman & Leach, Manchester, New Hampshire, Andrew B. Reid, Springer & Steinberg, Denver, Colorado, of counsel), filed a brief on behalf of Amicus Curiae National Police Accountability Project in support of Plaintiff-Appellant.

DEVALA A. JANARDAN, Bethesda, Maryland, filed a brief on behalf of Amicus Curiae International Municipal Lawyers Association in support of Defendants-Appellees.

KEARSE, Circuit Judge:

Plaintiff Jason M. Jackler, a former probationary police officer in Middletown, New York ("Middletown" or the "City"), appeals from a judgment of the United States District Court for the Southern District of New York, Cathy Seibel, Judge, dismissing his complaint, brought under 42 U.S.C. § 1983, alleging principally that defendant Matthew T. Byrne, Chief of the Middletown Police Department ("MPD" or the "Department"), and other members of the Department violated his First Amendment right to freedom of speech by causing the termination of his employment in retaliation for his refusals to make false statements in connection with an investigation into a civilian complaint alleging use of excessive force by a Department officer. To the extent pertinent to this appeal, the district court granted defendants' motion for judgment on the pleadings on the basis of Garcetti v.

2

Ceballos, 547 U.S. 410 (2006), and Weintraub v. Board of Education, 593 F.3d 196 (2d Cir.) ("Weintraub"), cert. denied, 131 S. Ct. 444 (2010), which held that when a public employee, pursuant to his official duties, makes statements that have no relevant analogue to speech by civilians who are not government employees, the government employee's speech is not protected by the First Amendment. On appeal, Jackler argues principally that Garcetti and Weintraub do not preclude First Amendment protection for his refusals to make false statements. For the reasons that follow, we agree and vacate the judgment insofar as it dismissed Jackler's First Amendment retaliation claims.

## I. BACKGROUND

The following description of the events recounts the allegations in the complaint--and the contents of exhibits attached to it--in the light most favorable to Jackler and draws all reasonable inferences in his favor, as required in a review of a Rule 12(c) dismissal of his action. See, e.g., Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010); Gumer v. Shearson, Hammill & Co., 516 F.2d 283, 286 (2d Cir. 1974) (on a Rule 12(c) motion to dismiss a complaint, "the well-pleaded material facts alleged in the complaint must be taken as admitted").

A. The Complaint's Assertion of First Amendment Claims

Jackler became a probationary police officer in MPD in January 2005. Byrne was the Chief of Police and senior administrator in charge of MPD's daily operations; defendants Paul Rickard and Patrick Freeman were MPD lieutenants and administrators. Decisions as to the hiring, retention, or promotion of MPD personnel were made by the City's Board of Police Commissioners (or "Board")

3

on the basis of information and recommendations provided by Byrne, Rickard, and Freeman. For nearly a year, Jackler was regarded as a good probationary officer.

### 1. The Events of January 5, 2006

On January 5, 2006, Jackler was dispatched to a "Mobil on the Run" convenience store in Middletown to assist MPD Sergeant Gregory W. Metakes in the arrest and transportation of one Zachary T. Jones. When Jackler arrived, Jones was handcuffed with his hands behind his back. Jackler opened the rear driver-side door of his patrol car, and Metakes placed Jones in the back seat. As Metakes closed the door, Jones called Metakes a "dick," loudly enough for both Jackler and Metakes to hear. Metakes immediately reopened the door and struck the still-handcuffed Jones in the face.

At the police station later that night, the MPD desk officer, Police Officer Sal Garretto, asked Jones about a large bump on Jones's head and abrasions on his face. Jones responded that during the arrest Metakes had, inter alia, smashed Jones's head into the ground, and that after handcuffing and placing Jones in the police car and hearing Jones call him a "dick," Metakes had punched Jones in the face. Both Garretto and MPD Lieutenant Warycka, the supervisor on duty that night, noted in written reports that they observed injuries to Jones's face. Jones stated that he wanted to talk to someone about making a complaint.

MPD had a written policy prohibiting the use of unnecessary or unjustified force. MPD Departmental Order number 03-01 dated March 21, 2003, entitled "USE OF PHYSICAL FORCE" ("MPD Order 03-01" or "MPD Directive")--a copy of which is attached to the complaint as Exhibit A--set out "guidelines for the use of force by members of [MPD]" (MPD Order 03-01, at 1)

and described permissible, escalating, "level[s] of force" (id. at 2-3).  It provided, in part, that

> [u]nnecessary force occurs when unjustified physical abuse of a person has occurred or when it is apparent that the type or degree of force employed was neither necessary nor appropriate, or when any degree of force is utilized as summary punishment or vengeance.  THE USE OF INDISCRIMINATE FORCE IS PROHIBITED.

(Id. at 1-2 (emphases added).)

Accordingly, on the night of January 5, 2006, with the assistance of Garretto and Warycka, Jones filed a civilian complaint against Metakes for the use of excessive force.  Jones's civilian complaint--a copy of which is attached to Jackler's complaint as Exhibit B--was filed on an MPD Police Personnel/Department Complaint Form ("MPD Complaint Form") and repeated Jones's description to Garretto of Metakes's actions during the arrest and Metakes's punching Jones in the face after he had been handcuffed and placed in the police car.  Jones's complaint stated that Jackler had witnessed the latter assault.  "**[U]nder penalty of perjury**," Jones signed the MPD Complaint Form, whose penultimate sentence stated:  "**False statements made in the foregoing complaint are punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law**"  (MPD Complaint Form (emphases in original)).


2. Jackler's Report and His Refusals To Make False Statements

The MPD Directive also included requirements that officers who used--or were present during the use of--physical force file written reports:

> Reporting - when a subject resists and physical force becomes necessary, to overcome said resistance, each officer who used physical force will complete a Subject Resistance Form for each person upon whom he/she used physical force. . . .
>
> An offense report will be completed by the officer who initially used

physical force and <u>a supplementary report will be completed by all other officers present whether they used physical force or not</u>.

(MPD Order 03-01, at 3-4 (emphasis added).)

On January 9, 2006, defendant Freeman directed Jackler to file a supplementary report detailing what had occurred in connection with Metakes's arrest of Jones. On the morning of January 11, Jackler filed his one-page report ("Jackler Report" or "Report"), which corroborated Jones's civilian complaint that, <u>inter alia</u>, after hearing Jones utter the word "dick," Metakes had reopened the car door and struck the handcuffed Jones in the face. Jackler's report--a copy of which is attached to his complaint as Exhibit C--stated as follows:

ON 1/5/06 AT APPROX. 8:55PM, I, OFFICER JACKLER, RESPONDED TO MOBIL ON THE RUN TO ASSIST SGT. METAKES OF THE NARCOTICS UNIT. UPON ARRIVAL, SGT. METAKES HAD A SUBJECT, NOW KNOWN TO ME AS ZACHARY JONES, HANDCUFFED AND UP AGAINST THE NARCOTICS CAR FOR DISORDERLY CONDUCT. I OBSERVED JONES TO HAVE MULTIPLE ABRASIONS ON HIS FACE. I OPENED UP THE DRIVER'S SIDE REAR-DOOR OF MY PATROL UNIT #6 AND SGT. METAKES PLACED JONES IN THE BACK SEAT. UPON CLOSING THE DOOR, JONES UTTERED THE WORD "DICK". SGT. METAKES THEN RE-OPENED THE DOOR AND STRUCK JONES IN THE FACE, THEN RE-CLOSED THE DOOR. WHILE I WAS TRANSPORTING JONES BACK TO [THE POLICE STATION] HE ASKED ME "IS HE ALLOWED TO DO THAT"? I STATED TO JONES TO DISCUSS THE SITUATION WITH THE OTHER OFFICER ONCE WE GET BACK [TO THE STATION].

Metakes, who has since been promoted to lieutenant, had a "close personal and professional relationship" with Byrne, Rickard, and Freeman (Complaint ¶ 22), and those defendants immediately sought "to cover-up and conceal the misconduct and illegal actions committed by Sgt. Metakes in connection with his arrest and apprehension of Jones on January 5, 2006" (<u>id</u>. ¶ 27). On the afternoon of January 11, Rickard and Freeman met with Jackler. At that meeting, they "threaten[ed]" Jackler (<u>id</u>. ¶ 30) and, as "direct[ed by] Chief Byrne," attempted to "coerce [Jackler]

to withdraw his supplemental report dated January 11, 2006 and refile a new report which contained false, incomplete and misleading information all in an effort to conceal the illegal actions and misconduct of Sgt. Metakes" (id. ¶ 31). Rickard and Freeman repeated their attempts in several subsequent meetings. The Jackler Report was truthful; Jackler refused to alter it and refused to provide a false report.

On January 19, Byrne and Rickard appeared at the monthly meeting of the Board of Police Commissioners. In retaliation for Jackler's refusals to alter or falsify his Report as to the conduct of Metakes, Byrne and Rickard recommended at that meeting that Jackler not be retained as a permanent police officer and that he be terminated as a probationary officer. In support of that recommendation, they presented the Board with false, incomplete, and misleading information, facilitated by Freeman, about Jackler's job performance. Because of defendants' misinformation and advice, the Board--which had never before terminated a probationary police officer, and which at that meeting voted to retain Jackler's fellow probationary officer as a permanent MPD officer and to hire four additional probationary officers--dismissed Jackler from further MPD employment, effective January 21, 2006.

B. The Motion To Dismiss and the District Court's Decision

Jackler commenced the present action pursuant to 42 U.S.C. § 1983 against Byrne, Rickard, and Freeman in their individual and official capacities, making the above allegations and asserting principally that defendants had caused, and conspired to cause, him to be dismissed from MPD in retaliation for his "refusal to cooperate with the defendants and commit a criminal act by altering or falsifying his supplemental report" (Complaint ¶ 51), in violation of his rights under the

7

First Amendment (see id. ¶¶ 43-53). He also asserted claims under the Fourth, Fifth, and Fourteenth Amendments and the Racketeer Influenced and Corrupt Organizations Act.

Defendants answered the complaint, admitting that Jackler had filed the Report, having been instructed to do so, and asserting that because his statements were made pursuant to his official duties, Jackler had no cognizable claim under the First Amendment. Defendants also asserted, inter alia, defenses of qualified immunity. They moved pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings as to all of Jackler's claims, contending principally that Jackler's First Amendment claims are barred by Garcetti v. Ceballos, 547 U.S. 410:

> Assuming, for the purposes of this motion, that everything contained in plaintiff's complaint is true, plaintiff is unable to state a claim upon which relief can be granted because based upon plaintiff's own pleadings, his speech was made pursuant to his official duties as a police officer. Therefore, plaintiff's speech is not protected by the First Amendment from employer discipline.

(Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings at 9.)

In opposition to defendants' motion, Jackler sought to defend only his First Amendment claims for retaliation, his Fourteenth Amendment substantive due process claims for loss of his position with MPD, and his claims that defendants conspired to deprive him of his First and Fourteenth Amendment rights. As to his First Amendment retaliation claims, Jackler argued that Garcetti is inapplicable. Whereas the plaintiff in Garcetti had been fired for engaging in speech that was required as part of his job, Jackler's First Amendment claims were based not on his Report, but only on his subsequent "refus[als] to commit a blatantly wrongful--if not criminal--act." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings ("Jackler Memorandum Opposing Motion") at 3.) It was "his refusal to speak or report falsely about a matter of serious public concern [that] form[ed] the basis of [his claims of a] First Amendment violation."

8

(Id. at 4 (emphases added).) Jackler argued that he "had a First Amendment right as a private citizen to decline the defendants' invitation to falsify his official report." (Id. at 4.)

Defendants submitted a reply memorandum in support of their motion, contending that there was no legally significant difference between Jackler's making the statements in his January Report and his refusals to make contrary statements. They argued that Garcetti is applicable "because it was plaintiff's duty as a police officer to issue the truthful report. Plaintiff's contention that he was terminated because he did not issue a false report merely states the same fact in different words." (Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion for Judgment on the Pleadings at 4.)

In a Memorandum Decision and Order dated February 11, 2010, reported at 708 F.Supp.2d 319, the district court granted defendants' motion to dismiss the complaint. As to Jackler's First Amendment retaliation claims, the court, relying principally on Garcetti and this Court's then-recent decision in Weintraub, 593 F.3d 196, ruled--reluctantly, see 708 F.Supp.2d at 324 n.5--that the complaint failed to state a viable claim because the speech of a government employee on a matter of public concern is not protected by the First Amendment unless he speaks "not as an employee in the course of his duties but rather as a citizen," id. at 323, and Jackler's "speech here was in his capacity as a police officer, not a citizen," id. at 324.

> Jackler's refusal to alter his report was done in his capacity as a police officer, and that refusal only occurred because he was an officer. Ironically, it is because he was a public employee with a duty to tell the truth that his insistence on fulfilling that duty is unprotected.

> But because the Second Circuit made so clear in Weintraub that speech is pursuant to official duties where it is "part-and-parcel of the employee's concerns about his ability to properly execute his duties," 593 F.3d at 203 . . . , and that in determining whether an employee speaks as a citizen the focus must be on the role the speaker occupied when he spoke, see id. . . . , and

9

because it is so clear on the facts as alleged by Jackler that he refused to withdraw or alter his truthful report in the belief that the proper execution of his duties as a police officer required no less, I do not see how I can avoid the conclusion that he was speaking as an officer, not a citizen, when he did so.

708 F.Supp.2d at 324-25 (other internal quotation marks and footnote omitted).

The district court dismissed Jackler's due process claims because "Jackler had no protectable property right in employment with the Middletown PD." Id. at 326. The court dismissed Jackler's claims that defendants had conspired to violate his constitutional rights because it found that he had not stated any viable claim of a constitutional violation. See id. at 325-26. The court deemed Jackler's undefended claims abandoned.

The court also stated that this Court's decision in Fierro v. City of New York, 341 F. App'x 696 (2d Cir. 2009) (summary order), might support defendants' assertion of qualified immunity. However, the court noted that there was no need to consider that defense in light of its determination that the complaint failed to state a cause of action; it also "decline[d] to reach . . . the [qualified immunity] issue on the ground that Defendants raised it only in their reply papers." 708 F.Supp.2d at 325 n.6.

Judgment was entered dismissing the complaint in its entirety, and this appeal followed. Although Jackler's notice of appeal indicated that he challenged all of the district court's rulings, his brief on appeal contains no argument that any ruling other than the dismissal of his First Amendment retaliation claims was incorrect, and we thus regard all of his other claims as abandoned. See generally Otero v. Bridgeport Housing Authority, 297 F.3d 142, 144 (2d Cir. 2002); Day v. Morgenthau, 909 F.2d 75, 76 (2d Cir. 1990); Kletschka v. Driver, 411 F.2d 436, 446-47 (2d Cir. 1969); Fed. R. App. P. 28(a)(9).

## II. DISCUSSION

On this appeal, the parties agree that Jackler's First Amendment claims are not that defendants retaliated against him for filing his Report but rather that they retaliated because of his refusals to follow their ensuing instructions to retract the Report and to speak falsely. (See, e.g., Jackler brief on appeal at 5 ("Having refused to alter his police report to cover-up a sergeant's unlawful use of force, plaintiff engaged in a protected First Amendment activity." (emphasis added)); Defendants' brief on appeal at 17 n.4 ("it is only plaintiff's refusal to withdraw the supplemental report and re-submit a false report that forms the basis for his First Amendment retaliation claim"); see also Jackler Memorandum Opposing Motion at 3-4 ("Jackler's official act of filing his January 11, 2006 report was not what constituted a violation of his First Amendment rights. Rather, his refusal to speak or report falsely about a matter of serious public concern is what forms the basis of plaintiff's [claims of a] First Amendment violation.").) Jackler contends that as he complains of retaliation for his refusals to retract his Report and make statements that were false, the district court erred in ruling that Garcetti and Weintraub required the conclusion that such a claim is beyond the scope of the First Amendment. Defendants urge affirmance on the ground that "[f]iling a truthful report and not filing a false report are the same act" (Defendants' brief on appeal at 21) and that both were "pursuant to [Jackler's] official duties as an officer and . . . , therefore, not protected by the First Amendment" (id. at 25-26). Defendants also argue that they are entitled to qualified immunity. For the reasons that follow, we conclude that the claim that defendants caused Jackler to be fired in retaliation for his

11

refusals to obey their instructions to retract his truthful filed Report and file a false report is not beyond the scope of the First Amendment.

A.  Government Employees and Their Limited First Amendment Rights

It is by now well established both that a citizen, upon entering government service, "by necessity must accept certain limitations on his or her freedom," Garcetti, 547 U.S. at 418; see, e.g., Waters v. Churchill, 511 U.S. 661, 671-73 (1994) (plurality opinion); Connick v. Myers, 461 U.S. 138, 143 (1983), and that "upon accepting public employment," such employees "do not check all of their First Amendment rights at the door," Lewis v. Cowen, 165 F.3d 154, 158 (2d Cir.) ("Lewis"), cert. denied, 528 U.S. 823 (1999); see, e.g., Garcetti, 547 U.S. at 417; Pickering v. Board of Education, 391 U.S. 563, 568 (1968).  "Government employers, like private employers, need a significant degree of control over their employees' words and actions" in order that employees not "contravene governmental policies or impair the proper performance of governmental functions," Garcetti, 547 U.S. at 418, 419; when acting "as an employer charged with providing such essential services as public safety and education," rather than a sovereign governing its citizens, a governmental entity has "greater leeway" under the Constitution "to control employees' speech that threatens to undermine its ability to perform its legitimate functions," Lewis, 165 F.3d at 161.

At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen.  The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.  See Perry v. Sindermann, 408 U.S. 593, 597 (1972).  So long as employees are speaking as citizens about matters of public concern, they must face **only** those speech restrictions that are necessary for their employers to operate efficiently and effectively.  See, e.g., Connick, supra, at 147 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government").

12

Garcetti, 547 U.S. at 419 (emphases added).

In Pickering, which the Garcetti Court called "a useful starting point" for describing the applicability of First Amendment principles to speech by government employees, 547 U.S. at 417, the Court ruled that, given that "the core value" protected by "the Free Speech Clause of the First Amendment" is "[t]he public interest in having free and unhindered debate on matters of public importance," Pickering, 391 U.S. at 573, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," Garcetti, 547 U.S. at 417 (citing Pickering, 391 U.S. at 568). See also Borough of Duryea v. Guarnieri, 131 S. Ct. 2488, 2491-92, 2497 (2011) (public concern test also applies to claims under the First Amendment's Petition Clause). If the speech is within the scope of First Amendment protection, the employer may not, because of that speech, penalize the employee without an adequate justification. See, e.g., Garcetti, 547 U.S. at 417; Pickering, 391 U.S. at 568. Thus,

> Pickering and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. See [391 U.S.] at 568. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. See Connick, [461 U.S.] at 147. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. See Pickering, 391 U.S., at 568.

Garcetti, 547 U.S. at 418 (emphases added).

In Garcetti, the Court parsed the first of the above "two inquiries" into separate questions as to (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke "as a citizen" rather than solely as an employee. See, e.g., id. at 420-22, 424. Whether speech is on a matter of public concern, which is a question of law, see, e.g.,

13

Connick, 461 U.S. at 148 n.7; id. at 150 n.10, is to be answered by the court after examining the "content, form, and context of a given statement, as revealed by the whole record," id. at 147-48. The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern. See, e.g., id. at 148 & n.8 (noting that the Connick plaintiff's private complaints about the assignments given to her did not implicate matters of public concern, whereas the private complaints of the plaintiff in Givhan v. Western Line Consolidated School District, 439 U.S. 410 (1979), concerning the school district's allegedly racially discriminatory policies clearly involved a matter of public concern). Nor does the fact that expressive conduct is public mean that its subject is a matter of public concern. See, e.g., City of San Diego v. Roe, 543 U.S. 77, 78, 84-85 (2004) ("Roe") (publication and sale of videotapes showing the plaintiff engaging in sexually explicit acts was not speech on a matter of public concern).

To constitute speech on a matter of public concern, an employee's expression must "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. Speech that, although touching on a topic of general importance, primarily concerns an issue that is "personal in nature and generally related to [the speaker's] own situation," such as his or her assignments, promotion, or salary, does not address matters of public concern. Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir.), cert. denied, 502 U.S. 1013 (1991); see, e.g., Connick, 461 U.S. at 148. "'Government offices could not function if every employment decision became a constitutional matter.'" Garcetti, 547 U.S. at 419 (quoting Connick, 461 U.S. at 143). Rather, a topic is a matter of public concern for First Amendment purposes if it is "of general interest," or "of legitimate news interest," or "of value and concern to the public at the time" of the speech. Roe, 543 U.S. at 83-84.

"Exposure of official misconduct, especially within the police department, is generally of great consequence to the public." Branton v. City of Dallas, 272 F.3d 730, 740 (5th Cir. 2001); see Garcetti, 547 U.S. at 425 ("governmental . . . misconduct is a matter of considerable significance"). The Fourth Amendment to the United States Constitution, which applies to the States through the Fourteenth Amendment, prohibits the use of excessive force by policemen in the course of an arrest, see, e.g., Graham v. Connor, 490 U.S. 386, 394 (1989), and it is a federal offense to deprive a person of his or her civil rights under color of law, see 18 U.S.C. § 242. Deliberate indifference to claims of such civil rights violations--tantamount to a custom or policy sufficient to support municipal liability under § 1983--may be inferred from a municipality's lack of appropriate response to repeated complaints of such violations. See, e.g., Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (reversing grant of summary judgment in favor of municipality, and remanding for trial, on the excessive-force claim of a plaintiff attacked by an off-duty police officer against whom several excessive-force complaints had been made); Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir. 1986) ("Fiacco") ("[w]hether or not the claims had validity, the very assertion of a number of such claims put the City on notice that there was a possibility that its police officers had used excessive force"), cert. denied, 480 U.S. 922 (1987). Thus, for several reasons, including public safety and welfare--as well as preservation of the public fisc, see, e.g., Colleen Long & Jennifer Peltz, AP Investigation: Nearly $1B in NYC Police Payouts, Associated Press, October 14, 2010 (New York City Police Department in the past decade paid "[m]ore than $23 million . . . to compensate for police bullets or brutality . . . . Some officers are sued multiple times . . . ." "Taxpayers foot the bill . . . .")-- police malfeasance consisting of the use of excessive force is plainly a matter of public concern.

"When an employee speaks as a citizen addressing a matter of public concern, the First

15

Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." Garcetti, 547 U.S. at 423; see, e.g., Waters, 511 U.S. at 668 (plurality opinion); Rankin v. McPherson, 483 U.S. 378, 384 (1987); Pickering, 391 U.S. at 568.

> The Pickering balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public. One hundred years ago, the Court noted the government's legitimate purpose in "promot[ing] efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service."

Connick, 461 U.S. at 150-51 (quoting Ex parte Curtis, 106 U.S. 371, 373 (1882) (emphases ours)). The weighing of the competing interests is a matter of law for the court. See, e.g., Waters, 511 U.S. at 668 ("it is the court's task to apply the [balancing] test to the facts") (plurality opinion); Lewis, 165 F.3d at 164 ("the magistrate judge erred when he submitted the Pickering balancing test to the jury to resolve"). In the Pickering balancing analysis, "the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." Connick, 461 U.S. at 150. "The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." Lewis, 165 F.3d at 162. And "if the allegations of internal misconduct are indeed true, [the employee's] statements could not have adversely affected the proper functioning of the department since the statements were made for the very reason that the department was not functioning properly." Brawner v. City of Richardson, 855 F.2d 187, 192 (5th Cir. 1988) (emphasis added).

If the employee did not speak as a citizen, the speech is not protected by the First Amendment, and no Pickering balancing analysis is required. See, e.g., Connick, 461 U.S. at 146; Garcetti, 547 U.S. at 423 ("When . . . the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny."). Whether the employee spoke solely as an employee

and not as a citizen is also largely a question of law for the court. The Garcetti Court stated that the nature of the employee's duties is to be determined as a "practical" matter; it observed that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform"; and it "reject[ed] . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions." Id. at 424-25. As a rule of thumb, activities required of the employee as part of his employment duties are not performed "as a citizen" if they are not "the kind of activity engaged in by citizens who do not work for the government," id. at 423.

In Weintraub, for example, this Court concluded that the plaintiff teacher's complaints of classroom disorder, which related to his core duties as a teacher, were not protected by the First Amendment in part because "his speech ultimately took the form of an employee grievance" filed with his union, 593 F.3d at 203 (emphasis added), for which there was "no relevant analogue to citizen speech," id. at 198; see id. at 204. We indicated that the complaints by Weintraub would have had a relevant civilian analogue if, instead of lodging them with his union, he had "voic[ed] his grievance through channels available to citizens generally," id. The matter of whether the government employee's duties do or do not have a civilian analogue is a question of law. See, e.g., id. at 200.

The Garcetti Court dealt with a First Amendment claim by a deputy district attorney who alleged that he was punished for writing a disposition memorandum that criticized an affidavit on which a search warrant had been based and that "advise[d] his supervisor about how best to proceed with [the] pending case." 547 U.S. at 421. The plaintiff "wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." Id. The Court noted that the parties did not dispute that the deputy had given his advice "pursuant to his employment duties," id. at 424, and it indicated that the giving of such advice had no civilian analogue, see id. at 423-24. The

17

Court concluded that the deputy's statements were not protected by the First Amendment.

B.  The Rights of Civilians To Say Only What They Believe Is True

Most of the above cases dealt with government employees who complained that they were penalized by their employers on account of statements the employees affirmatively made. Jackler, in contrast, contends that he was penalized for his refusals to follow defendants' instructions that he retract his Report and make statements that would have been untrue, and that his refusals are protected by the First Amendment.

> There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees "freedom of speech," a term necessarily comprising the decision of both what to say and what not to say.

Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 796-97 (1988) (emphasis in original); see, e.g., Wooley v. Maynard, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.").

In Wooley, for example, the Court upheld a First Amendment challenge by New Hampshire citizens to that State's requirement that their cars bear license plates displaying the slogan "Live Free or Die," contrary to their political, religious, moral, or ethical views. The Court stated,

> we are faced with a state measure which forces an individual, as part of his daily life--indeed constantly while his automobile is in public view--to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable. In doing so, the State "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control."

430 U.S. at 715 (quoting Board of Education v. Barnette, 319 U.S. 624, 642 (1943)); see, e.g.,

18

Wooley, 430 U.S. at 717 ("where the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message").

In the context of an official investigation into possible wrongdoing, a citizen has a right--and indeed, in some circumstances, a duty--to give evidence to the investigators. See, e.g., Kaluczky v. City of White Plains, 57 F.3d 202, 210 (2d Cir. 1995) ("Voluntarily appearing as a witness in a public proceeding or a lawsuit is a kind of speech that is protected by the First Amendment."); 18 U.S.C. § 4 (making it a felony, "[with] knowledge of the actual commission of a [federal] felony" to "conceal[] . . . the same"). A law enforcement officer does not, by reason of his public employment, lose his civic right to give evidence. See, e.g., Dobosz v. Walsh, 892 F.2d 1135, 1141 (2d Cir. 1989) (police officer "clearly was exercising his right to free speech when he cooperated with the F.B.I. and when he testified against his fellow officer in court").

The simple right to give evidence is not at issue here because Jackler's contention is only that he suffered retaliation for refusing to retract his Report and refusing to substitute statements that were false. However, when a person does give evidence, he has an obligation to speak truthfully. For example, it is a federal offense to make "any materially false, fictitious, or fraudulent statement or representation" in any matter within the jurisdiction of the federal government, 18 U.S.C. § 1001. It is also an offense under New York law to make a false report with respect to a crime:

> A person is guilty of falsely reporting an incident in the third degree when, knowing the information reported . . . to be false or baseless, he . . . [g]ratuitously reports to a law enforcement officer or agency . . . false information relating to an actual offense . . . .

N.Y. Penal Law § 240.50 (McKinney 2008). Similarly,

> [a] person is guilty of offering a false instrument for filing in the second degree

19

when, knowing that a written instrument contains a false statement or false information, he offers or presents it to a public office or public servant with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office or public servant.

N.Y. Penal Law § 175.30 (McKinney 2010). Indeed, as quoted in Part I.A.1. above, the MPD Complaint Form signed by Jones warned that any false statement made on such a form would expose him to criminal liability under N.Y. Penal Law § 210.45, which provides that "[a] person is guilty of making a punishable false written statement when he knowingly makes a false statement, which he does not believe to be true, in a written instrument bearing a legally authorized form notice to the effect that false statements made therein are punishable." The term "person" in such provisions plainly includes police officers. Cf. People v. Saporita, 132 A.D.2d 713, 715, 518 N.Y.S.2d 625, 627-28 (2d Dep't 1987) (ruling that, although a new trial was required because of prosecutorial misconduct, the evidence was sufficient to convict the defendant police officers of tampering with police records in order to conceal the misfeasance of one of the officers, see N.Y. Penal Law § 175.20 (McKinney 2010) ("A person is guilty of tampering with public records in the second degree when, knowing that he does not have the authority of anyone entitled to grant it, he knowingly removes, . . . makes a false entry in or falsely alters any record or other written instrument filed with, deposited in, or otherwise constituting a record of a public office . . . ." (emphases added))). See also 18 U.S.C. § 1512(c) (making it a crime to "alter[] . . . or conceal[] a record . . . with the intent to impair [its] integrity or availability for use in an official [federal] proceeding" (emphases added)); id. § 1519 (same for "knowingly alter[ing], . . . falsif[ying], or mak[ing] a false entry in any record . . . with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any [federal] department or agency" (emphases added)). Thus, retracting a truthful statement to law enforcement officials and substituting one that is false would expose the speaker--

20

whether he be a police officer or a civilian--to criminal liability.

Nor does anyone have authority to require a witness to retract his true statements and make statements that are false, for the persons who induce someone to commit a crime such as those described above are themselves guilty of that crime. See, e.g., 18 U.S.C. § 2(a) ("Whoever . . . counsels, commands, induces or procures [the] commission [of an offense against the United States] is punishable as a principal."); N.Y. Penal Law § 20.00 (McKinney 2009) ("When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the [requisite] mental culpability . . . , he solicits, requests, commands, [or] importunes . . . such person to engage in such conduct.").

In Lewis, discussed in Part II.A. above, the plaintiff, head of the lottery unit of a state's revenue division, contended that he was fired for refusing to testify dishonestly before the state's Gaming Board with respect to proposed changes to a lottery game--a contention that initially gave us pause, see 165 F.3d at 165, but that foundered for lack of proof at trial:

> We agree that Lewis had a strong First Amendment interest in testifying truthfully before the Board but we do not believe that interest to have been implicated here. Lewis was directed to present the Division's views, not his own. Although Lewis understood [the] order [to present the proposed changes in a positive light] to mean that he should "lie" to the Board, there is no evidence that [the division's executive director] or anyone else ordered Lewis to misrepresent either the facts or his personal views to the Board.

Id. at 166 (emphases added).

C. Jackler's Refusals To Misrepresent the Events He Witnessed

In the present case, Jackler had a strong First Amendment interest in refusing to make a report that was dishonest. We think it clear that his refusals to change his statement as to what he

21

witnessed when Metakes struck Jones were directed at a matter of public concern, rather than an effort to further some private interest of Jackler personally. The use of excessive force by a police officer is a matter of serious public concern for the reasons discussed in Part II.A. above. Metakes's use of force against Jones did not implicate Jackler's ability to do his own job properly, and the record contains no indication that Jackler had any personal interest in describing Metakes's conduct. Rather, the pleadings indicated (1) that on the drive to the police station, when Jones attempted to complain to Jackler about Metakes's punch, Jackler simply told Jones to raise the matter with Metakes (see Complaint Exhibit C); (2) that the first member of MPD to raise any question with respect to Jones's injuries was the desk officer, Garretto, not Jackler (see Complaint Exhibit D); (3) that Jones, in his civilian complaint filed on the night of January 5, stated that Jackler had been a witness to Metakes's punch (see Complaint Exhibit B); and (4) that it was not until January 11, after being instructed on January 9 by Freeman to file a report, that Jackler made his Report stating that Metakes had reopened the patrol car door and struck the handcuffed Jones in the face (see Complaint Exhibits C and D). After having filed his truthful Report, Jackler simply refused to comply with the demands of his superiors that he proceed to deviate from the truth as to Metakes's use of force.

We also think it clear that Jackler's refusal to accede to defendants' demands that he falsely exculpate Metakes has a civilian analogue. As indicated by the authorities discussed above, a citizen has a First Amendment right to decide what to say and what not to say, and, accordingly, the right to reject governmental efforts to require him to make statements he believes are false. Thus, a citizen who has truthfully reported a crime has the indisputable right to reject pressure from the police to have him rescind his accusation and falsely exculpate the accused. And, as indicated by laws such as the statutory provisions described in Part II.B. above, a civilian who acceded to such pressure

22

would subject himself to criminal liability, as would a police officer. Of course a police officer has a duty not to substitute a falsehood for the truth, i.e., a duty to tell "nothing but the truth"; but he plainly has that duty as a citizen as well.

As we indicated in Weintraub, an indicium that speech by a public employee has a civilian analogue is that the employee's speech was to "'an independent state agency'" responsible for entertaining complaints by "'any citizen in a democratic society regardless of his status as a public employee,'" 593 F.3d at 204 (quoting Freitag v. Ayers, 468 F.3d 528, 545 (9th Cir. 2006), cert. denied, 549 U.S. 1323 (2007)). A police department plainly is such an agency. Here, Jones, a civilian, filed a presumably accurate complaint with MPD stating that Metakes, after shutting him in the patrol car, reopened the door upon hearing the insult and struck him in the face. MPD could not, consistent with the First Amendment, have forced Jones to withdraw his complaint and say falsely that Metakes had done no wrong. Jackler, having witnessed Metakes's attack and corroborated Jones's allegation, was entitled to the same constitutional protection as Jones against being forced to retract his true statement and instead make a statement that would exculpate Metakes falsely.

Although defendants argue that Jackler's refusals were part of his job and that Garcetti requires affirmance because otherwise any employee who simply files a truthful report could claim that his First Amendment rights were implicated because he did not file a false one, we reject that contention because it ignores the context of Jackler's refusals. Jackler's allegation--which must be accepted as true in the context of judgment on the pleadings--was that Rickard and Freeman, as directed by Chief Byrne, repeatedly attempted to force him to withdraw the truthful report he had filed and to submit one that was false. In the context of the demands that Jackler retract his truthful statements and make statements that were false, we conclude that his refusals to accede to those

demands constituted speech activity that was significantly different from the mere filing of his initial Report.

In sum, it is clear that the First Amendment protects the rights of a citizen to refuse to retract a report to the police that he believes is true, to refuse to make a statement that he believes is false, and to refuse to engage in unlawful conduct by filing a false report with the police. We conclude that Jackler's refusal to comply with orders to retract his truthful Report and file one that was false has a clear civilian analogue and that Jackler was not simply doing his job in refusing to obey those orders from the department's top administrative officers and the chief of police.

D.  Balancing MPD's Interests Against Those of Jackler

Having concluded that Jackler's refusals to retract his truthful Report and make statements that would have been false constituted speech by Jackler as a citizen on a matter of public concern, and hence were within the scope of the First Amendment, we turn to the question of whether defendants can prove that they were nonetheless entitled to retaliate against Jackler in the interest of promoting efficient operation within MPD. Given that employees speaking as citizens about matters of public concern "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively," Garcetti, 547 U.S. at 419 (emphasis added), this question does not require extended consideration.

The government as an employer has broad discretion to manage its operations. But that discretion does not include authority to coerce or intimidate its employees to engage in criminal conduct by filing reports that are false in order to conceal wrongdoing by another employee or to conceal eyewitness corroboration of civilian complaints of such wrongdoing. Thus, given that if "a

24

number of such claims" are asserted, that very fact serves to "put the [police department] on notice" that an officer may be using excessive force, Fiacco, 783 F.2d at 328, a department that disapproves of the use of such force and is not indifferent to its use will retain records of such claims. It would be inappropriate for the department to seek to conceal such claims, or to require a citizen to withdraw a truthful claim, or to seek to conceal a witnessing officer's corroboration of the events alleged in such a claim. See generally Frank v. Relin, 1 F.3d 1317, 1331 (2d Cir.) ("If [the defendant District Attorney] fired [the plaintiff] because she 'blew the whistle' on Brady [v. Maryland, 373 U.S. 83 (1963)] violations [by Assistant District Attorneys], that consideration could not outweigh her First Amendment right to speak up about those violations, no matter how piercing the whistle to the ears of the ADAs."), cert. denied, 510 U.S. 1012 (1993).

If defendants are proven to have caused Jackler's termination in retaliation for his refusal to retract his truthful Report and make false statements in order to conceal Metakes's use of excessive force, their actions cannot be seen as promoting "integrity" in the discharge of MPD's responsibilities, Connick, 461 U.S. at 151 (internal quotation marks omitted), or furthering the "proper performance of governmental functions," Garcetti, 547 U.S. at 419 (emphasis added).

E. Qualified Immunity

Qualified immunity, an affirmative defense as to which the defendants have the burden of proof, see, e.g., Gomez v. Toledo, 446 U.S. 635, 640 (1980), shields officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that

25

a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("Creighton"). "'This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" Wilson v. Layne, 526 U.S. 603, 615 (1999) (quoting Creighton, 483 U.S. at 640).

Thus, if the law was sufficiently "clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19. Though a mere mistake in the performance of an official duty may not deprive the officer of the defense, the qualified immunity doctrine does not shield performance that either was in violation of clearly established law or was plainly incompetent. See, e.g., Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986))).

Defendants in the present case urge, as an alternative basis for affirmance, that they "be dismissed from this action" on the basis of qualified immunity (Defendants' brief on appeal at 32). The district court did not decide the issue of qualified immunity, given defendants' failure to raise that issue in their motion until their reply brief, see 708 F.Supp.2d at 325 n.6, and given the court's dismissal of Jackler's First Amendment retaliation claims on the basis of the pleadings, see id., although the district court stated that, based on this Court's decision in Fierro v. City of New York, 341 F. App'x 696 (2d Cir. 2009) (summary order) ("Fierro"), the qualified immunity defense would appear to be viable, see 708 F.Supp.2d at 325 n.6. While we leave it to the district court in the first instance to decide the merits of that defense following the jury's resolution of any factual issues

needed to inform that decision, the invocation of the qualified immunity defense and the references by defendants and the district court to Fierro warrant several observations.

First, all of the freedom-of-speech cases cited in Parts II.A. and B. above--except Garcetti and Weintraub--had been decided before defendants retaliated against Jackler. Thus, in January 2006, when Jackler was terminated, it had been clearly established that the First Amendment protected a citizen's decision both as to what to say and what not to say, and that it protected a government employee, including a police officer, speaking as a citizen on a matter of public concern, against retaliation for that speech except where the government's interest in the agency's proper functioning outweighed the employee's First Amendment right. Several years before the events in the present case, we cited Pickering, Waters, Rankin, and Connick and stated that "[t]he employee's right to be free from such retaliation has been clearly established since at least 1968." Munafo v. Metropolitan Transportation Authority, 285 F.3d 201, 211 (2d Cir. 2002). Any uncertainty introduced by Garcetti and Weintraub, which were not decided until after defendants' retaliation against Jackler (and which, for the reasons discussed above, do not deprive Jackler of First Amendment protection for his refusals to lie), would not entitle defendants to qualified immunity because the availability of that defense depends on whether the unlawfulness of their conduct was apparent in light of "'pre-existing law,'" Wilson, 526 U.S. at 615 (quoting Creighton, 483 U.S. at 640 (emphasis ours)); Hope v. Pelzer, 536 U.S. 730, 739 (2002) (same); United States v. Lanier, 520 U.S. 259, 271-72 (1997) (same).

Second, although the district court stated that this Court's decision in Fierro "would seem to require the conclusion that the defendants are qualifiedly immune here," 708 F.Supp.2d at 325 n.6, Fierro was decided by summary order. Under this Court's Rules, and as stated in the heading of

our summary orders deciding appeals, "RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT." See 2d Cir. Local R. 32.1.1(a). Although "[d]enying summary orders precedential effect does not mean that the court considers itself free to rule differently in similar cases," Order dated June 26, 2007 (adopting 2d Cir. Local R. 32.1., amended in other respects and renumbered 32.1.1, effective Jan. 1, 2010), the rationale underlying the Rule is that such orders, being summary, frequently do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case to make our summary ruling applicable to the new case. In Fierro itself, for example, we stated our usual assumption that the parties were familiar with the facts; we described the plaintiff simply as "refus[ing] to follow [the principal's] order to submit false and damaging information about two teachers at the school"; and we provided no details such as what the plaintiff had been instructed to say or to whom the allegedly "false and damaging information" was to have been "submit[ted]." The facts of that case may or may not be similar to those at issue here. But Fierro does not require the court to uphold the qualified immunity defenses asserted here for, by Rule, Fierro has no precedential effect.

Finally, because a claim asserted against a government official in his official capacity is essentially a claim against the governmental entity itself, the defense of qualified immunity, which may be available to individual defendants as they are sued in their individual capacities, is not applicable to claims against them in their official capacities. See generally Hafer v. Melo, 502 U.S. 21, 25 (1991); Kentucky v. Graham, 473 U.S. 159, 165-67 (1985); Owen v. City of Independence, 445 U.S. 622, 638 (1980); Monell v. Department of Social Services, 436 U.S. 658, 690 n.55 (1978). And "there is no tradition of immunity for municipal corporations." Owen, 445 U.S. at 638.

Jackler's complaint asserted claims against defendants in both their individual and

28

official capacities. Thus, even if the court were eventually to determine that defendants are entitled to qualified immunity on the claims against them in their individual capacities, that determination would not entitle them to dismissal of the official-capacity claims. See generally Kentucky v. Graham, 473 U.S. at 166 n.11 ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office. See Fed. Rule Civ. Proc. 25(d)(1); Fed. Rule App. Proc. 43(c)(1); [Supreme] Court[] Rule 40.3.").

## CONCLUSION

We have considered all of defendants' arguments in support of affirmance and have found them to be without merit. The judgment of the district court is vacated to the extent that it dismissed Jackler's claims against defendants for retaliation in violation of the First Amendment, and the matter is remanded for trial or for such other proceedings as are not inconsistent with this opinion. Costs to plaintiff.

Jackler v. Byrne, No. 10-0859-cv

Sack, Circuit Judge, concurring

--------------------------------------------------------------

I fully concur in Judge Kearse's opinion for the panel. I write separately only to offer an observation as to one aspect of the panel opinion.

This case is about plaintiff Jason Jackler's refusal to "make false statements in connection with an investigation into a civilian complaint alleging use of excessive force by a [Middletown Police] Department officer," ante at **[2],** and the Town Board of Police Commissioners' subsequent decision not to hire Jackler -- then a probationary police officer -- on a permanent basis. The Board allegedly acted at the behest of the defendant officials, who wished to punish Jackler for his refusal to falsify his previously filed report about alleged police misbehavior. In light of the fact that this litigation involves a refusal to speak falsely as directed by a public official, unlike the more common case, see id. at **[18],** where a public employee is sanctioned because he or she spoke in a manner of which government officials disapproved, see id., the panel opinion makes clear that the difference between the two is, for present purposes, immaterial. See id. at **[19-20].** I agree.

In support of that proposition, however, the panel quotes this statement by the United States Supreme Court in Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781 (1988):

> There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference <u>is without constitutional significance</u>, for the First Amendment guarantees "freedom of speech," a term necessarily comprising the decision of both what to say and what <u>not</u> to say.

<u>Id.</u> at 796-97 (Brennan, <u>J.</u>) (first emphasis supplied); <u>see</u> <u>ante</u> at **[18]**. The panel also quotes <u>Wooley v. Maynard</u>, 430 U.S. 705 (1977): "[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." <u>Id.</u> at 714; <u>see</u> <u>ante</u> at **[18]**.

The Supreme Court made these statements, and the panel invokes them, in response to the argument that compelled speech may receive <u>less</u> protection under the First Amendment than does compelled silence. The panel's conclusion otherwise does not, however, imply the converse conclusion that compelled speech can never receive <u>more</u> solicitude than compelled silence.

Justice Jackson, speaking for the Court, remarked some time ago that "[i]t would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." <u>W. Va. State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 633 (1943) (holding that state-compelled flag salute and pledge violate the First Amendment); <u>see also</u> <u>Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston</u>, 515 U.S. 557, 573-74 (1995) ("Outside the context [of commercial speech, the State] may not

-2-

compel affirmance of a belief with which the speaker disagrees. . . . This general rule . . . applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid . . . .").

I write only to note the possibility that despite the notion of equivalence reflected in the panel opinion and the Supreme Court opinions from which it quotes, it is possible that in some circumstances not before us today, government compulsion to speak (or indeed to act) may well be <u>more</u> strictly limited than government compulsion not to speak (or act[1]).

The Soviet purge trials of the 1930's remain notorious in large measure because they were marked by "confessions . . . made under pressure of intensive torture and intimidation," 9 <u>New Encyclopaedia Britannica Micropaedia</u> 808 (15th ed. 2002), <u>available at</u> <u>http://www.britannica.com/EBchecked/ topic/483936/purge-trials</u> (latest visit July 11, 2011).  And it seems unlikely that Galileo's dispute with Church authorities

---

[1] <u>Cf., e.g.</u>, <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 405-06 (2d Cir. 2011) ("The burden [for obtaining an injunction] is even higher on a party like [the appellant] that seeks 'a mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo.'" (citation omitted)); <u>Doninger v. Niehoff</u>, 527 F.3d 41, 47 (2d Cir. 2008) (characterizing the standard for mandatory injunctions as "more rigorous" than that for prohibitory injunctions); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice & Procedure</u> § 2942 (2d ed. 1995) ("It has been said that courts are more reluctant to grant a mandatory, or affirmative, injunction than a prohibitory, or negative, one.").

about Copernican theory, <u>see</u> Dava Sobel, <u>Galileo's Daughter</u> 231-81 (1999); Jerome J. Langford, <u>Galileo, Science and the Church</u> 152-54 (3d ed. 1992), would be as infamous had he been forbidden to assert -- as he apparently believed -- that the earth moves about the sun, rather than forced to state publicly and contrary to his conviction that the sun revolves around the earth.[2]

---

[2] <u>See</u> <u>Recantation of Galileo (June 22, 1633)</u>, http://law2.umkc.edu/faculty/projects/ftrials/ galileo/recantation.html (latest visit July 19, 2011) (reproducing Galileo's attestation from Giorgio de Santillana, <u>The Crime of Galileo</u> 312-13 (1955)).