**17-76-cv**
*Montero v. City of Yonkers, et al.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued:  September 08, 2017        Decided:  May 16, 2018)

Docket No. 17-76-cv
_____

RAYMOND MONTERO,

*Plaintiff-Appellant,*

– v. –

CITY OF YONKERS, NEW YORK, KEITH OLSON, in his official and individual capacities, BRIAN MORAN, in his official and individual capacities, JOHN MUELLER, in his official and individual capacities,

*Defendants-Appellees,*

POLICE ASSOCIATION OF THE CITY OF YONKERS, INC., AKA YONKERS POLICE BENEVOLENT ASSOCIATION, EDMUND HARTNETT, in his official and individual capacities,

*Defendants.*
_____

Before:        KATZMANN, *Chief Judge*, SACK and HALL, *Circuit Judges*.

_____

Plaintiff-Appellant Raymond Montero appeals from a judgment entered in favor of Defendants-Appellees the City of Yonkers, Keith Olson, Brian Moran, and John Mueller by the United States District Court for the Southern District of New York (Kenneth M. Karas, *Judge*).  Montero, a Yonkers police officer and former Yonkers police union official, alleges that the defendants violated his First Amendment right to freedom of speech by retaliating against him for criticizing management decisions by Yonkers police officials during the course of two union meetings.  The district court agreed with the defendants that because Montero's union speech was not made in his capacity as a private citizen, his union remarks were not protected by the First Amendment and he could therefore not state a claim for retaliation against the defendants.  We conclude that because Montero's union remarks were not made pursuant to his official duties as a police officer, he spoke as a private citizen for purposes of the First Amendment.  We also conclude, however, that defendants Moran and Mueller are entitled to qualified immunity, and that Montero has not alleged a plausible claim for municipal liability against the City of Yonkers.  Accordingly, the district court's judgment is:

AFFIRMED in part, VACATED in part, and REMANDED for further proceedings.

_____

CHRISTOPHER D. WATKINS, Sussman & Associates, Goshen, New York, *for Plaintiff-Appellant*.

ELIZA M. SCHEIBEL (Lalit K. Loomba, *on the brief*), Wilson, Elser, Moskowitz, Edelman & Dicker LLP, White Plains, New York, *for Defendants-Appellees City of Yonkers, New York, Brian Moran, and John Mueller*.

ANDREW C. QUINN, The Quinn Law Firm, PLLC, White Plains, New York, *for Defendant-Appellee Keith Olson*.

_____

SACK, *Circuit Judge*:

Plaintiff-Appellant Raymond Montero, a Yonkers, New York police officer and former union official in the Police Association of the City of Yonkers, Inc., also known as the Yonkers Police Benevolent Association (the "Yonkers PBA"), appeals from an order of the United States District Court for the Southern District of New York (Kenneth M. Karas, *Judge*) dismissing pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure his First Amendment employment retaliation claim against Defendants-Appellees the City of Yonkers, Keith Olson, Brian

Moran, and John Mueller (the "City defendants"). Montero alleges that the City defendants violated his First Amendment right to freedom of speech by retaliating against him for criticizing management decisions by Yonkers police officials at two Yonkers PBA meetings. The district court held that because the speech at issue was not made in Montero's capacity as a private citizen, his union remarks were not protected by the First Amendment and he could therefore not state a claim for retaliation against the City defendants.

We conclude that because Montero's union remarks were not "'part-and-parcel of his concerns' about his ability to 'properly execute'" his official job duties, *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir.) (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)), *cert. denied*, 562 U.S. 995 (2010), he spoke as a private citizen for purposes of his First Amendment right to free speech. We also conclude, however, that defendants Moran and Mueller are entitled to qualified immunity, and that Montero has not alleged a plausible claim for municipal liability against the City of Yonkers. Accordingly, we affirm the district court's dismissal of the plaintiff's First Amendment retaliation claim against defendants Moran, Mueller, and the City of Yonkers, vacate the district

4

court's dismissal of the plaintiff's First Amendment retaliation claim against defendant Keith Olson, and remand the case for further proceedings.

**BACKGROUND**

As required in our review of a dismissal under Federal Rule of Civil Procedure 12(b)(6), "[w]e . . . accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 2279 (2017).

*Montero's Union Remarks*

Montero has been a police officer in the City of Yonkers Police Department (the "YPD") for more than twenty-seven years. In January 2010, the Yonkers PBA, which serves as the official union for the YPD, held elections. Montero was elected vice president. Defendant Olson, a fellow Yonkers police officer, was elected president.

Montero testified that Olson had opposed Montero's candidacy, favoring another police officer, Michael Farina, for vice president instead. Following the

election, tensions between Montero and Olson increased dramatically.  In June 2010, during a Yonkers PBA meeting, Montero criticized Olson's close relationship with then Police Commissioner Edmund Hartnett.  He said that Hartnett's decision to discontinue several police units—those "dedicated to investigating domestic violence and burglary" and the "community unit dedicated to supporting the Police Athletic League"—would adversely affect the YPD, the Yonkers PBA, and the surrounding community.  Am. Compl. ¶¶ 15-17.  Montero alleges that shortly thereafter, Mueller, then a lieutenant and at the time of the filing of the complaint, the acting Police Chief of the YPD, pulled him into his office, and told Montero to stop criticizing the YPD and Police Commissioner Hartnett, or Montero would be transferred to another division.  Despite Mueller's warning, at a Yonkers PBA meeting in February 2011,[1] Montero called for a no-confidence vote with respect to Hartnett.

---

[1] Although the amended complaint does not specify where Montero made these comments, the parties' briefing indicates that he did so at this union meeting. *Montero v. City of Yonkers*, 224 F. Supp. 3d 257, 260 (S.D.N.Y. 2016).

*The Alleged Retaliation Against Montero*

Based on his comments at the June 2010 and February 2011 union meetings (the "union speech" or "union remarks"), Montero alleges that Olson, acting with Olson's close associates Mueller and Detective Sergeant Moran, engaged in a campaign of retaliation against him.[2]  The district court discussed Olson, Moran, and Mueller's actions in some detail.  *Montero v. City of Yonkers*, 224 F. Supp. 3d 257, 260-63 (S.D.N.Y. 2016).  We rehearse those allegations only insofar as we think them relevant to this appeal.

In March 2011, a month after Montero's call for a no-confidence vote with respect to Police Commissioner Hartnett, Montero alleges, Olson, Mueller, and Moran conducted an unauthorized investigation focused on Montero's use of overtime slips.  Because of this investigation, Montero asserts that the YPD

---

[2] We note that, although the plaintiff alleges in his amended complaint that he criticized Olson's leadership from January 2010 to January 2012, he provides no specific examples of such assertedly protected speech other than the June 2010 and February 2011 union speeches discussed above.  Nor did Montero raise any other examples during oral argument before the district court, in his briefs below, in his appellate briefs, or in oral argument before this Court.  Consequently, like the district court, we focus our attention on whether these two speech incidents were constitutionally protected.

wrongly denied him forty hours of compensatory pay and issued a disciplinary write-up of him. The next month, Montero alleges he was transferred from the Special Investigations Unit, which Montero describes as "highly desirable," to the (less desirable) Detective Division. Am. Compl. ¶ 27. While in the Detective Division, Montero was apparently assigned to desk duty, and became ineligible for overtime pay. According to Montero, a month later, Olson admitted to him that this transfer was directed by Moran and at Mueller's instruction, and was effected because of Montero's criticisms of Olson's leadership of the Yonkers PBA at the June 2010 union meeting and Hartnett's leadership of the YPD at the June 2010 and the February 2011 union meetings.

In September 2011, Montero alleges, Mueller conducted a second unauthorized investigation of Montero, this time for insubordination. That same month, Olson, after learning that Montero was planning to run against him for the Yonkers PBA presidency, allegedly confronted Montero, calling him a "fucking pussy" and threatening to "kick his ass" for refusing to debate him. Am. Compl. ¶ 29. Montero asserts that his office was vandalized shortly thereafter, with pictures of "The Cowardly Lion" posted throughout it. Although Montero

8

alleges that he reported Olson's threats and the vandalism of his office to the YPD's Internal Affairs Department, the department apparently took no action in response to these reports.

In January 2012, Montero further alleges, Olson, Mueller, and Moran conducted a third unauthorized investigation of Montero, this time seeking to prove that Montero had been outside of his home while on sick leave. Although Montero contends that he had permission to leave his residence during this period, the YPD nevertheless docked him two days' salary.

In August 2012, Montero alleges, Olson told Montero's commanding officer, Detective Sergeant Michael Kivel, among other things, that "[Montero] better be fucking careful." Am. Compl. ¶ 43. These remarks apparently followed Montero's refusal to acknowledge Olson and Moran's presence while visiting a fellow officer receiving medical treatment in a hospital. Although Montero states that Kivel reported Olson's comments to Internal Affairs, the department apparently, once again, undertook no investigation.

In October 2013, Montero asserts, Olson sent a text message to Montero telling him that he wanted Montero to meet him "in another jurisdiction and

9

preferably off duty," which the plaintiff understood to be a threat of violence. Am. Compl. ¶ 50. Also in September, Montero asserts, Olson "compelled" Internal Affairs to investigate Montero for his alleged communications with a reporter from the *Yonkers Tribune*, following an online article criticizing Olson's leadership of the Yonkers PBA. Am. Compl. ¶ 52. When Montero refused to tell Internal Affairs whether he was the source of the article, the YPD—allegedly at Olson's behest—threatened Montero with termination.

In January 2014, at a Yonkers PBA meeting, Olson formally called for Montero's expulsion from the union. When Montero attempted to leave the meeting, he was allegedly blocked from exiting by one of Olson's allies. According to Montero, at Olson's behest, police officers then seized videotapes of the meeting. Montero once more reported Olson's actions to Internal Affairs, but the department again allegedly refrained from confronting or disciplining Olson.

In February 2014, Montero asserts, Mueller urged Police Chief William Cave to remove Montero as the YPD's representative at county-wide intelligence meetings. After Cave agreed, Montero contends, he lost an additional twenty-four hours of pay per month. Later that year, Montero alleges, Olson started a

petition about him containing false statements, after which Montero was formally expelled from the Yonkers PBA.

Finally, in July 2014, Montero alleges, his office was broken into and his shield stolen. Shortly thereafter, Moran returned Montero's shield, and wrote a report that he had received it from another person who had found it discarded on the street. Montero thinks Moran stole his shield with the intention that Montero be disciplined by his superiors for losing it, although no disciplinary measures were taken against him.

*The District Court Proceedings*

In June 2015, Montero initiated an action under 42 U.S.C. § 1983 in the United States District Court for the Southern District of New York alleging that the City defendants had retaliated against him for his remarks at union meetings in violation of the First Amendment. Following a pre-motion conference held on September 9, 2015, Montero amended his complaint, providing additional alleged facts in support of his claims. On March 4, 2016, the City defendants moved to dismiss Montero's amended complaint on the grounds that: (1) Montero had failed to state a claim for retaliation in violation of the First Amendment; (2)

11

Moran and Mueller were entitled to dismissal based on their qualified immunity; (3) Montero did not sufficiently plead an adverse employment action against Olson; and (4) Montero failed to state a claim for municipal liability against the City of Yonkers.

On December 20, 2016, the district court granted the City defendants' motions to dismiss with prejudice, holding that Montero's remarks at the June 2010 and February 2011 meetings were not constitutionally protected because Montero had not made them while acting as a "private citizen," as was required to create a cause of action based on his constitutional right to free speech. Because the district court found this issue to be dispositive, it did not consider any of the City defendants' remaining arguments for dismissal.

In its opinion, the district court relied principally on the Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410 (2006). There, the Court made clear that, to determine whether a public employee's speech is constitutionally protected, courts must determine both that the employee spoke as a private citizen and that the speech at issue addressed a matter of public concern. *See Garcetti*, 547 U.S. at 417; *see also Montero*, 224 F. Supp. 3d at 264-65 (citing *Garcetti*).

12

The district court concluded that Montero had not been speaking as a private citizen when he made the statements at issue. In reaching that conclusion, the court relied principally on our decision in *Weintraub v. Board of Education*. *Montero,* 224 F. Supp. 3d at 265-71.

In *Weintraub*, a public-school teacher filed a grievance through his union complaining about his school's failure to discipline a student who had assaulted him. 593 F.3d at 198-99. Relying on *Garcetti*, we concluded that because Weintraub's grievance was pursuant to his official teaching duties, he did not speak as a private citizen. *Id*. at 203 (concluding that "Weintraub's grievance was pursuant to his official duties because it was part-and-parcel of his concerns . . . as a public school teacher—namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning") (citation and internal quotation marks omitted). We also thought it relevant that union grievances had no civilian analogue, or a "form or channel of discourse available to non-employee citizens." *Id*. at 204.

Here, the district court decided that, at the motion to dismiss stage, it could not resolve whether Montero's union remarks were made in accordance with his

13

official duties as a police officer. *See Montero*, 224 F. Supp. 3d at 266-69. The district court further determined that, although the union meetings contained no civilian analogue, the absence of a civilian analogue was not dispositive, and turned to the "content and circumstances" of Montero's union remarks. *Id*. at 269-70. Because Montero's union speech "lacked any civilian analogue, and because Plaintiff's speech, made behind closed doors outside the presence of both the public and Commissioner Hartnett, was at least tangentially related to his official duties," *id.* at 271, the district court ultimately concluded that Montero was not protected by the First Amendment from retaliation for his remarks, *id.* at 273. Accordingly, the district court dismissed Montero's complaint. *Id.* at 275.

We conclude that the district court correctly held that the existence of a civilian analogue is not dispositive of whether a public employee spoke as a private citizen, but it is merely a factor the court could consider as part of the inquiry into whether the public employee's speech was made pursuant to his ordinary employment-related responsibilities. We nevertheless find that the district court erred in ruling that Montero's speech was not protected because it

14

was tangentially related to his job responsibilities. That fact is not dispositive as a matter of law.

It is clear from the pleadings that Montero's union remarks did not fall within his responsibilities as a police officer, and he therefore made these remarks as a private citizen. Because at least some of Montero's remarks addressed a matter of public concern, moreover, we vacate and remand the district court's judgment dismissing Montero's First Amendment retaliation claim as to defendant Olson. We affirm the district court's dismissal of the claims against defendants Moran and Mueller for a different reason: their alleged acts were protected by the doctrine of qualified immunity. Finally, we affirm the dismissal of Montero's claim for municipal liability against the City of Yonkers for failure to state a claim upon which relief could be granted.

**DISCUSSION**

I.    Standard of Review

"We review *de novo* the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting all factual allegations as true and drawing all

reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 566. The complaint's allegations, however must be "plausible on [their] face," a standard that "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

II.     First Amendment Retaliation Claim

Where, as here, a plaintiff claims that he or she was retaliated against in violation of the First Amendment, he or she must plausibly allege that "(1) his [or her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him [or her]; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).

For many years, "the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment," including those terms which restricted his or her right to speak freely in the workplace. *Garcetti*, 547 U.S. at 417 (internal quotation marks omitted). In *Pickering v. Board of Education*, 391 U.S. 563 (1968), however, the Supreme Court made clear that public employees do not automatically surrender all their rights of free expression at the

16

office door. An employee may be protected from retaliation even when speaking in the workplace when he or she is speaking "as a citizen . . . upon matters of public concern." *Id.* at 568.

The Supreme Court, relying on *Pickering*, 391 U.S. at 568, and *Connick v. Myers*, 461 U.S. 138, 147 (1983), further explained in *Garcetti v. Ceballos* that the First Amendment inquiry must proceed in two parts. "The first [component] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418 (citations omitted). If the first component is present, an employer must then show that it "had an adequate justification for treating the employee differently [based on his or her speech] from any other member of the general public." *Id.* (citing *Pickering*, 391 U.S. at 568).

*A. Citizen Speech*

In *Garcetti*, the plaintiff, Richard Ceballos, a prosecutor in the Los Angeles District Attorney Gil Garcetti's office, sent a memorandum to his supervisor asserting that a search warrant affidavit in a case being prosecuted by the office

17

contained significant misrepresentations. *Id.* at 420. The supervisor declined to dismiss the case in which the affidavit was being used, and Ceballos testified for the defense about these misrepresentations. *Id.* at 414-15. Ceballos subsequently alleged that because of the memorandum, he had been subject to various retaliatory employment actions by Garcetti's office. *Id.*

The Supreme Court stated that "when public employees make statements pursuant to their official duties," which the Court determined that Ceballos had, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id*. at 421. Although the Court refrained from proffering a detailed definition of what constitutes one's "official duties," it noted that "[w]hen a public employee speaks pursuant to [his or her] employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

In *Lane v. Franks*, 134 S.Ct. 2369 (2014), the Supreme Court further considered what qualifies as "citizen speech." There, the director of a state program for underprivileged youth asserted that he was demoted by the state

18

because of his testimony to a federal grand jury about issues relating to his department's payroll. *Id.* at 2375-78. The Eleventh Circuit had decided that the plaintiff had not engaged in citizen speech, inasmuch as his testimony concerned information learned solely during the course of his employment. *Id.* at 2378-79.

The Supreme Court reversed. It noted that "*Garcetti* said nothing about speech that simply relates to public employment or [that] concerns information learned in the course of public employment," and that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen— speech." *Id.* at 2379.

This Court has sought to further refine the characteristics of public employee speech that is also protected citizen speech for purposes of the First Amendment. In *Weintraub*, as described above, a public-school teacher filed a grievance through his union chastising his superiors' failure to discipline a student who had assaulted him. 593 F.3d at 198-99. We concluded that Weintraub's grievance did not constitute citizen speech because the communication was "part-and-parcel" of his ability to execute his "official duties"

19

as a school teacher—"namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning." *Id*. at 203 (citation and internal quotation marks omitted).

We also thought it significant that Weintraub's union grievance lacked a citizen analogue, i.e., a "relevant analogue to speech by citizens who are not government employees." *Id*. (quoting *Garcetti*, 547 U.S. at 424). In *Garcetti*, the Supreme Court provided two examples of speech containing a citizen analogue: (1) "a schoolteacher's 'letter to a local newspaper,'" which "bore similarities to letters submitted by numerous citizens every day," and (2) "discussi[ons] [of] politics with a co-worker." *Id*. at 203-04 (quoting *Garcetti*, 547 U.S. at 422-23). The plaintiff in *Weintraub*, by contrast, had "made an internal communication pursuant to an existing dispute-resolution policy established by his employer." *Id.* at 204. Such a grievance was "not a form or channel of discourse available to non-employee citizens." *Id*. Although we cautioned that this "lack of a citizen analogue" was not dispositive of the question whether the plaintiff spoke in the

exercise of his official employment duties, it provided additional evidence that Weintraub had not spoken as a citizen—"the central issue after *Garcetti*." *Id.*[3]

In *Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011), *cert. denied*, 565 U.S. 1234 (2012), and *Ross v. Breslin*, 693 F.3d 300 (2d Cir. 2012), we further considered what constitutes "citizen speech" for these purposes.

In *Jackler*, the plaintiff, a probationary police officer, alleged that he had been terminated by the police department by which he was employed for refusing to retract a report that he had made to an independent state agency in support of a civilian complaint accusing a fellow officer of using excessive force. 658 F.3d at 230-32. The district court dismissed the suit under Rule 12(c), reasoning that the plaintiff refused to alter his report while acting in his capacity as a police officer. *Id.* at 233. We reversed, holding that the officer's refusal was not made pursuant to his employment duties because his obligation to do so was based on his

---

[3] We note the possibility that *Weintraub* could have been decided on the public-concern prong and not on the basis that the plaintiff was not acting as a private citizen. In that case, though, we ultimately focused on whether the plaintiff was required to file a union grievance about troublesome students as part of his employment duties, rather than the content of the plaintiff's speech (i.e., what he was protesting). 593 F.3d at 201-204.

obligation as a citizen to obey the law. We noted that it was illegal for both civilians and police officers to make materially false statements to government officers and agencies when providing evidence. *Id*. at 239 (citing 18 U.S.C. § 1001; N.Y. Penal Law § 240.50; N.Y. Penal Law § 175.30). Thus, the *Jackler* Court recognized that a public employee speaks "as a citizen" when he or she refuses to commit a crime because *all* citizens have a duty to follow the law. *Id* at 240.

Additionally, in line with *Weintraub*, 593 F.3d at 204, we stated in *Jackler* that "an *indicium* that speech by a public employee has a civilian analogue is that the employee's speech was to an independent state agency responsible for entertaining complaints by any citizen in a democratic society regardless of his status as a public employee." 658 F.3d at 241 (italicization provided and internal quotation marks omitted). We noted that our holding was bolstered by the fact that Jackler had made his report to an independent state agency, *id*., a "channel[] available to citizens generally," *id*. at 238 (quoting *Weintraub*, 593 F.3d at 204).

In *Ross*, a payroll-clerk typist alleged that she was retaliated against by her employers for reporting financial malfeasance to a superior. 693 F.3d at 302. We first observed that "the inquiry into whether a public employee is speaking

22

pursuant to her official duties is not susceptible to a brightline rule." *Id*. at 306. In making that assessment, we said, courts "must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two. Other contextual factors, such as whether the complaint was also conveyed to the public, may [also] properly influence a court's decision." *Id*. We concluded that because "reporting pay irregularities to a supervisor" was one of the plaintiff's job duties and "made in furtherance of those duties," the speech at issue was not made in her capacity as a citizen. *Id.* at 308. She was therefore not protected by the First Amendment from retaliation for making her report. *See id.* at 306, 308.

Most recently, in *Matthews*, 779 F.3d at 169, we considered whether a police officer had acted as a private citizen for purposes of assessing his First Amendment rights in criticizing an arrest-quota policy to his commanders. In reviewing the Supreme Court's decisions in *Garcetti* and *Lane*, and our prior case law, we identified two relevant inquiries to determine whether a public employee speaks as a citizen: (1) whether "the speech fall[s] outside of the employee's 'official responsibilities,'" and (2) whether "a civilian analogue exist[s]." *Id*. at 173

23

(citing *Weintraub*, 593 F.3d at 203-04). We concluded that Matthews's complaints were not what he was "employed to do," *id*. at 174 ("Matthews had no role in setting policy; he was neither expected to speak on policy nor consulted on formulating policy."), and ordinary citizens were also "regularly provided the opportunity to raise issues with the [p]recinct commanders," *id*. at 176 ("Matthews did not follow internal grievance procedures, but rather went directly to the [p]recinct commanders . . . who had an open door to community comments and complaints."). Matthews had thus spoken as a citizen and was therefore constitutionally protected against employment retaliation.

There may be some confusion as to whether both questions (1) and (2) in *Matthews*—i.e., whether (1) the speech was outside the speaker's official responsibilities and (2) there was a civilian analogue—must be answered in the affirmative for the speech to be protected citizen speech under *Garcetti*. *See., e.g.*, *Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 467 (D. Conn. 2016), *appeal dismissed in part*, 885 F.3d 111 (2d Cir. 2018) ("*Matthews I* makes it clear that the existence of a civilian analogue is typically a prerequisite to a holding that the employee was speaking as a citizen."). We think that the Supreme Court has

24

made the answer clear: Although the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties," *Lane*, 134 S.Ct. at 2379. We said as much in *Weintraub*: "Although the lack of a citizen analogue is not dispositive in this case, it does bear on the perspective of the speaker—whether the public employee is speaking as a citizen—which is the central issue after *Garcetti*." 593 F.3d at 204 (citation and internal quotation marks omitted). Ultimately, the question, then, is whether the employee's speech was "part-and-parcel of [that person's] concerns about his ability to properly execute his duties." *Id.* at 203 (citation and internal quotation marks omitted).

In the case at bar, the district court therefore was correct in deciding that the lack of a civilian analogue was not critical to a decision as to whether Montero spoke as a private citizen. *Montero*, 224 F. Supp. 3d at 270-71. But the district court treated this factor as analytically distinct from the core inquiry: whether Montero's union remarks were made pursuant to his official employment responsibilities. *See id.* at 266-68. Instead, the district court concluded that,

irrespective of whether Montero's union statements could be considered part of his job responsibilities, the lack of a civilian analogue combined with the fact that Montero's union remarks were "tangentially *related to* his official duties" indicated he had not spoken as a private citizen. *Id.* at 271 (emphasis added). Because the district court did not squarely determine whether Montero's union speech was made *pursuant* to Montero's employment duties, its decision that the remarks necessarily failed to qualify as citizen speech protected by the First Amendment was thus at best premature.

We conclude that Montero sufficiently pled that his union remarks cannot be considered "part-and-parcel of his concerns about his ability to properly execute his duties." *Weintraub*, 593 F.3d at 203 (citation and internal quotation marks omitted). The "critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S.Ct. at 2379. Montero made his remarks as union vice president, a role in which he was not required to serve. *See Matthews*, 779 F.3d at 174 (concluding that the plaintiff's speech was not part of his official duties where it "was neither part of his job description nor part of the

26

practical reality of his everyday work"). Nor is it determinative that Montero's union remarks may have touched on matters that he learned through the course of his employment. *See Lane*, 134 S.Ct. at 2379 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."). Because, based on his pleading, Montero's remarks did not fall within his employment responsibilities, the district court erred in concluding on a motion to dismiss that Montero spoke as an employee.

Nevertheless, Montero would have us go further and decide categorically, as some circuits have, that when a person speaks in his or her capacity as a union member, he or she speaks as a private citizen. *See Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015) ("It is axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official."); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1060 (9th Cir. 2013) ("Given the inherent institutional conflict of interest between an employer and its employees' union, we conclude that a police officer does not act in furtherance of his public duties when speaking as a representative of the police union."); *Nagle v. Vill. of Calumet*

*Park*, 554 F.3d 1106, 1123 (7th Cir. 2009) (noting that when one speaks "in his capacity as a union official, his comments [are] made as a citizen rather than as a public employee").

In support of this position, Montero cites *Clue v. Johnson*, 179 F.3d 57 (2d Cir. 1999). There, various union officers alleged that they had suffered employment retaliation after seeking to recall union leaders whom they viewed as having colluded with management. *Id*. at 59-60. We stated, albeit in dicta, that "[t]here is no doubt that retaliation against public employees solely for their union activities violates the First Amendment," and that "activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern." *Id*. at 60-61.

But we think *Clue* is unhelpful here. First, *Clue*'s broad dicta that union activities criticizing management constitute matters of public concern has been walked back by our subsequent case law. *See Lynch v. Ackley*, 811 F.3d 569, 582 (2d Cir. 2016) ("Though the court [in *Clue*] said in dicta that 'retaliation solely for union activity clearly raises a public concern' . . . it obviously did not mean that all activities undertaken through a union necessarily become matters of public

28

concern merely by virtue of their collateral connection to the union.") (quoting 179 F.3d at 61). Second, and we think more important, *Clue* was decided prior to *Garcetti*. Post-*Garcetti*, it is clear that courts must not only determine whether the plaintiff spoke on a matter of public concern, but whether he or she spoke as a private citizen—an inquiry not contemplated by *Clue*.

While we therefore decline to decide categorically that when a person speaks in his capacity as a union member, he speaks as a private citizen, we conclude that, under the facts of this case as set out in the amended complaint, when Montero spoke in his capacity as a union member, he spoke as a private citizen. This was because, taking the amended complaint's allegations as true, Montero spoke in his role as a union officer, and his union speech was not composed of statements made as a "means to fulfill" or "undertaken in the course of performing" his responsibilities as a police officer. *Weintraub*, 593 F.3d at 203 (quotation marks omitted). Consequently, he engaged in citizen speech for purposes of the First Amendment.

*B.  Matter of Public Concern*

If Montero spoke as a citizen, it does not necessarily follow that his speech was constitutionally protected.  The successful plaintiff must also demonstrate that the speech at issue was on a matter of public concern.  *Garcetti*, 547 U.S. at 418.

Whether speech is on a matter of public concern is a question of law, and "is to be answered by the court after examining the 'content, form, and context of a given statement, as revealed by the whole record.'" *Jackler*, 658 F.3d at 235 (quoting *Connick*, 461 U.S. at 147-48).  "To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Id*. at 236 (quoting *Connick*, 461 U.S. at 146); *see also City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (stating that a topic is a matter of public concern if it is of "general interest" or of "legitimate news interest").  On the other hand, speech that principally focuses on "an issue that is 'personal in nature and generally related to [the speaker's] own situation,'" *Jackler*, 658 F.3d at 236 (quoting *Ezekwo v. N.Y.C. Health & Hosps. Corp*., 940 F.2d 775, 781 (2d Cir.), *cert. denied*, 502 U.S. 1013 (1991)) (brackets in original),

30

or that is "calculated to redress personal grievances"— even if touching on a matter of general importance—does not qualify for First Amendment protection, *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir.), *cert. denied*, 528 U.S. 823 (1999).

Because the district court found that Montero did not make his union remarks as a private citizen, it did not reach the issue of whether all such remarks implicated matters of public concern. In a footnote, the district court asserted that Montero's criticism of Olson's leadership, which stemmed from their union rivalry, did not involve a matter of public concern. *Montero*, 224 F. Supp. 3d at 274 n.3. Nevertheless, the district court stated that whether Montero's "opposition to cuts that were allegedly 'bad for the community,' implicat[ed] a public concern present[ed] a closer question," *id*. (quoting Am. Compl. ¶¶ 16-17), a question it declined to answer.

The district court did not err when it found that Montero's criticism of Olson's union leadership reflected a personal rivalry between two union leaders, and concluded that it thus "plainly do[es] not implicate a public concern." *Id.; see* Am. Compl. ¶ 15 (stating that Montero criticized Olson's leadership of the Yonkers PBA, and in particular his cozy relationship with Hartnett, Olson's

31

agreement to manpower cuts, and Olson's preference that "his close friend,

Mueller, be made a Police Chief"). But we conclude, as a matter of law, that

Montero has sufficiently alleged that his June 2010 union remarks expressing

opposition to some of Commissioner Hartnett's personnel cuts and Montero's call

at the February 2011 meeting for a no-confidence vote with respect to Hartnett

involved matters of public concern. Am. Compl. ¶¶ 16-17, 20. In his amended

complaint, Montero specifically alleges that he criticized Hartnett for

discontinuing police units "dedicated to investigating domestic violence and

burglary" and "the community unit dedicated to supporting the Police Athletic

League," cuts which Montero believed were "bad for the police force, bad for

members of the PBA and bad for the community[.]" *Id*. at ¶¶ 16-17. Such speech

about the termination of the police units—which Montero allegedly stated would

endanger public safety—plainly constituted speech on a matter "of political,

social, or other concern" to the Yonkers community. *See Connick*, 461 U.S. at 146.

In response, the City defendants contend that these remarks, made at two

closed-door meetings, reflect no more than Montero's own ambition: to be elected

the Yonkers PBA president. And to be sure, "[a] public employee may not

32

transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ruotolo v. City of N.Y.*, 514 F.3d 184, 190 (2d Cir. 2008) (quoting *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007)); *see also Ezekwo*, 940 F.2d at 781 (stating that personal grievances do not become public concerns by "the mere fact that one or two of [the plaintiff's] comments could be construed broadly to implicate matters of public concern"). As we have noted, however, an "individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large." *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014); *see also Nagle v. Marron*, 663 F.3d 100, 107 (2d Cir. 2011) ("We agree that the primary question for First Amendment purposes is whether the matter is of public concern, not whether the speech was also made to serve some private interest.").

At this stage in the proceedings, we cannot say that Montero's union remarks about how reductions in police manpower might reduce public safety and his call for a vote of no-confidence in Commissioner Hartnett were solely "calculated to redress [his] personal grievances" against Olson and his allies. *Lewis*, 165 F.3d at 163. Nor, despite the City defendants' contentions otherwise,

do we find it critical to this inquiry that Montero made his remarks at a non-public meeting. *See Jackler*, 658 F.3d at 235 ("The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern." (citing *Connick*, 461 U.S. at 148 & n.8)). We therefore conclude that Montero has sufficiently pled that his criticism of cuts in police manpower at the June 2010 union meeting and his call for a no-confidence vote in Police Commissioner Hartnett at the February 2011 union meeting qualified as statements on matters of public concern.[4]

   *C. Liability of Defendant Olson*

   To succeed on a First Amendment retaliation claim, a plaintiff must show not only that the speech at issue was constitutionally protected, but that as a result of this speech, he or she suffered an adverse employment action caused by the defendant. *Cox*, 654 F.3d at 272. An adverse employment action may include

---

[4] Because the issue has not been briefed by either party and requires determining matters of fact that we cannot determine in the first instance on the present record, we do not consider *Pickering*'s third inquiry: "whether the relevant government entity had an adequate justification for treating the employee differently [for his or her speech] from any other member of the general public." *Garcetti*, 547 U.S. at 418 (citing *Pickering*, 391 U.S. at 568).

discharging, refusing to hire, refusing to promote, demoting, reducing the pay, or reprimanding an employee. *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (citing *Rutan v. Republican Party*, 497 U.S. 62, 75 (1990), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012)). Such actions may also include a pattern of harassment, where, using an "objective standard," a plaintiff shows that "the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).

On appeal, defendant Olson contends that an adverse employment action must be caused by "a supervisor, employer, a member of management, or a hiring body." Def. Olson's Br. at 25. Because the pleadings demonstrate that he occupied none of those positions vis-à-vis Montero, Olson argues that he cannot be found liable for taking any adverse employment actions against the plaintiff. In response, Montero contends that Olson, a "union president who has an exceedingly close relationship with management" and used this relationship to "exact revenge against [the] plaintiff on the job," can be held responsible for violating Montero's First Amendment rights by, at the very least, influencing

35

supervisors to retaliate against the plaintiff for his union speech. Pl.'s Reply Br. at 19-20.

In focusing on whether Olson can be found liable for an adverse employment action, however, both parties have put the cart before the horse. To make a successful section 1983 claim, a plaintiff must show that the defendant not only violated a constitutional right, but acted "under the color of state law." *Cox*, 654 F.3d at 272. A defendant can only be said to do so if his or her actions were made as a state actor, or where the person acts "in his official capacity or while exercising his responsibilities pursuant to state law." *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 230 (2d Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 49-50 (1988)).

As noted above, the parties dispute whether Olson, as a concededly non-supervisory employee, can be said to have taken an adverse employment action against Montero in the context of a First Amendment retaliation claim. The parties have not addressed, however, whether Olson qualifies as a "state actor" in the first place and if he can therefore be held liable under section 1983 for his

36

alleged retaliatory actions. We therefore leave this issue to be addressed on remand.[5]

*D. Liability of Defendants Moran and Mueller*

Defendants Moran and Mueller argue that even if Montero's speech was constitutionally protected and they took adverse employment actions against him for this speech, they are, even on the present state of the proceedings, entitled to qualified immunity. We agree.

Qualified immunity, an affirmative defense, shields officials from personal liability for civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (explaining that a right is clearly established

---

[5] We also note that Olson, unlike Moran and Mueller, did not raise qualified immunity in his Rule 12(b)(6) motion to the district court and has therefore failed to preserve the right to raise this affirmative defense on appeal. *See Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1019 (2d Cir. 1989) ("[The appellant] did not raise this issue at the district court . . . and so [] failed to preserve its claim for appeal."). Olson may, however, still raise that affirmative defense in his answer. *See Santos v. District Council*, 619 F.2d 963, 967 (2d Cir. 1980).

when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right").  "[T]he need for 'clearly established' law is satisfied if the law on the subject was defined at the time with reasonable clarity or clearly foreshadowed in rulings of the Supreme Court or the Second Circuit, so that the defendant should have understood that her conduct was unlawful."  *Lynch*, 811 F.3d at 578-79.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Wilson v. Layne*, 526 U.S. 603, 615 (1999).  Put simply,[6] qualified immunity "provides [] protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

It is true that at the time Moran and Mueller allegedly retaliated against Montero, we had stated in *Weintraub* that the "lack of a citizen analogue [was] 'not dispositive' in [that] case."  593 F.3d at 204 (quoting *Garcetti*, 547 U.S. at 420).  As detailed above, the role of a citizen analogue in determining whether one speaks

---

[6] Perhaps rather *too* simply.

as a citizen remained murky, however, and we had expressed no view as to its role in protecting union speech outside the context of a union grievance. *See Sira v. Morton*, 380 F.3d 57, 81 (2d Cir. 2004) ("To be clearly established, a right must [be] recognized in a particularized rather than a general sense."). Thus, we had not made clear that, under the circumstances as alleged in the amended complaint, Montero spoke in his capacity as a private citizen.

On appeal, Montero contends, once again, that *Clue* "clearly establishe[s]" that a person's union activity criticizing management is categorically protected by the First Amendment. Pl.'s Reply Br. at 10. But, as noted above, *Clue* was decided before *Garcetti*, and focused solely on whether the union plaintiffs had spoken on a matter of public concern. *See discussion in section II A., supra.* After *Garcetti*, it is clear that courts must determine both whether the plaintiff spoke on a matter of public concern and whether he or she spoke as a private citizen. Moreover, in *Weintraub*, we plainly rejected the notion that one is necessarily speaking as a private citizen when acting in his or her union capacity.

Because the specific question of whether the plaintiff's alleged union remarks were protected by the First Amendment was not beyond debate at the

39

time of Moran and Mueller's alleged retaliation against Montero, nor does *Clue* hold otherwise, we conclude as a matter of law that under the claims as pled by Montero, these defendants are protected from liability by qualified immunity.

   *E.  Municipal Liability*

   In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court established that municipalities may be construed as "persons" in the context of violations of section 1983, and that they may be subjected to direct claims for monetary, declaratory, or injunctive relief where the municipality allegedly implemented an unconstitutional custom or policy.  *Id.* at 690-91, 694-95. Such a custom or policy may be reflected through policy statements, ordinances, regulations, or decisions "officially adopted and promulgated by that body's officers."  *Id.* at 690.

   Although "official policy" often refers to formal rules or customs that intentionally establish "fixed plans of action" over a period of time, when a municipality "chooses a course of action tailored to a particular situation," this may also "represent[] an act of official government 'policy' as that term is commonly understood."  *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d

40

Cir. 2004) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986)). Nor must such policies be authorized or ratified by multiple decisionmakers of the municipality in question for liability to accrue. "[E]ven a single action by a decisionmaker who 'possesses final authority to establish municipal policy with respect to the action ordered'" may deprive the plaintiff of his or her constitutional rights. *Id.* at 126 (quoting *Pembaur*, 475 U.S. at 481). When a non-decisionmaker committed the constitutional violation, however, the plaintiff must show that the decisionmaker ordered or ratified such a subordinate's conduct or "was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.*

In his amended complaint, Montero asserts that the YPD, "acting through its final policymaking officials," aided Olson and his allies in retaliating against him, and that the department "adopted an unwritten policy" in doing so by condoning and ratifying this action. Am. Compl. ¶¶ 84-86. But "[t]he mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of N.Y.*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other*

*grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).

Montero nevertheless contends that a reasonable juror could conclude that he was retaliated against at the specific behest of then Police Commissioner Hartnett, who, as a final policymaker, allegedly had the requisite authority to carry out Montero's continual investigations, transfers, and pay cuts. Montero fails to allege, however, that Hartnett had or should have had any knowledge of these retaliatory actions.[7] He asserts only that Mueller told him that Hartnett "did not like what Plaintiff had been saying about Hartnett and others at PBA meetings." Am. Compl. ¶ 19; *see Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction

---

[7] Montero does assert that "high ranking officers within the Department advised the City's corporation counsel that Plaintiff was the subject of ongoing harassment and negative treatment" based on his opposition to Olson's union leadership and that the YPD took no action in response to this. Am. Compl. ¶ 55. Montero does not allege that this information ever reached Hartnett or any other final decisionmaker, however.

violations of constitutional rights."), *cert. denied*, 134 S.Ct. 125 (2013). Moreover, Montero specifically asserts that it was Olson, Moran, and Mueller who directed the retaliatory actions against him. Because Montero merely asserts the existence of a policy or custom instituted or promulgated by the YPD or conducted or deliberately ignored by its policymakers, he has failed to plausibly claim that the City of Yonkers can be held municipally liable for violating his First Amendment rights.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's dismissal of the plaintiff's First Amendment retaliation claims against defendants Moran, Mueller, and the City of Yonkers, VACATE the district court's dismissal of the plaintiff's First Amendment retaliation claim against defendant Keith Olson, and REMAND for further proceedings.